IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KAREN PETTIGREW,                       :
                                       :
      Plaintiff,                       :
                                       :
v.                                     :      CIVIL ACTION NO.
                                       :      1:15-CV-2360-TWT-JCF
ATLANTA INDEPENDENT SCHOOL             :
SYSTEM a/k/a ATLANTA PUBLIC            :
SCHOOLS,                               :
                                       :
      Defendant.                       :

## FINAL REPORT AND RECOMMENDATION

This case is before the Court on Defendant's Motion for Summary
Judgment. (Doc. 28).

## PROCEDURAL HISTORY

Plaintiff Karen Pettigrew ("Plaintiff" or "Pettigrew") was formerly
employed by the Atlanta Independent School System ("Defendant" or "APS") as
an elementary school teacher from the fall of 1998 until June 3, 2014, when
Defendant did not renew her employment contract for the following school-year.
(Doc. 1 at ¶ 36; Doc. 28-1 at ¶¶ 36, 44). On June 30, 2015, she initiated this
lawsuit against APS (Doc. 1), alleging that it declined to renew her employment
contract on the basis of age, in violation of the Age Discrimination in Employment

1

Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq.  (*See generally* Doc . 1).  APS filed an answer (Doc. 4), and discovery proceeded.

APS has now filed a motion for summary judgment (Doc. 28), with supporting brief (Doc. 28-2), a statement of undisputed material facts (Doc. 28-1), and exhibits (Docs. 28-3 through 28-15).  Plaintiff filed a brief in response to APS's motion (Doc. 36), a statement of material facts (Doc. 46-1), a response to the statement of undisputed material facts (Doc. 37), and exhibits (Docs. 38 through 41).  APS submitted a reply brief (Doc. 45) and a response to Plaintiff's statement of material facts (Doc. 45-1).  With briefing complete, the undersigned turns to the merits of APS's motion.

## FACTS

The facts, for summary judgment purposes only, are derived from APS's statement of material facts (Doc. 28-1, "Def. SMF"); Pettigrew's statement of additional material facts (Doc. 37-1, "Pl. SMF"); and uncontroverted record evidence.  Many of the facts are taken from the depositions of Pettigrew (Doc. 28-13, "Pettigrew Dep."), Maureen Wheeler (Doc. 28-11, "Wheeler Dep."), and Robin Glenn (Doc. 28-8, "Glenn Dep.").

The undersigned has reviewed the record, including the parties' filings, to determine whether genuine issues of material fact exist to be tried.  Yet the court need not "scour the record" to make that determination.  *Tomasini v. Mt. Sinai*

*Med. Ctr. of Fla.*, 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004) (internal quotation omitted). The facts are construed in the light most favorable to Plaintiff as the non-movant. *See Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1309 (11th Cir. 2001).

Pettigrew was born on January 17, 1964. (Pettigrew Dep. at 28:17). She began her employment with APS in 1998, (*id.* at 21:2-4), and began working at Hope Hill Elementary School ("Hope Hill") at some point during 2012. (Def. SMF ¶ 5). When she started at Hope Hill, she was forty-nine years old. (*Id.*). Hope Hill is located in Atlanta and serves students from pre-kindergarten to fifth-grade. (*Id.* ¶ 13). At the end of the 2012-2013 school-year, Hope Hill ranked in the lowest 10 percent of high-poverty schools in APS in terms of the achievement gap between high-performing and low-performing students. (*Id.* ¶ 14). During the 2012-2013 school-year at Hope Hill, Barbara Lashley was the principal, and Leah Goodwin-Black was the Assistant Principal. (*Id.* ¶ 6; Wheeler Dep. at 62:17-19).

Over the course of the 2012-2013 school-year, Ms. Lashley recorded a "Needs Development" rating from a "walk-through" observation of Pettigrew's classroom. (*See* Doc. 28-14). During the same year, Ms. Goodwin recorded two "Needs Improvement" ratings from casual walk-through observations, and one "Needs Improvement" rating for a more formal "formative assessment" at the end

of the year.  (*Id.* at 34-35; *see also* Pettigrew Dep. at 161:4-166:8).[1]  Following

Lashley's departure, Maureen Wheeler became the principal at Hope Hill for the

---

[1]  Plaintiff's Complaint alleges that "[p]rior to the 2013-2014 school-year at Hope[]Hill, Ms. Pettigrew had always received at least 'satisfactory,' 'meets expectations'/exceeds expectations,' or 'proficient' scores on her professional evaluations throughout her entire teaching career."  (Doc. 1 at ¶ 18).  In her deposition, Plaintiff sought to clarify that statement:

> Q:     [Counsel for Defendant] You testified earlier that never before in your career before Ms. Wheeler had you received anything less than satisfactory; is that correct?
> A:     [Plaintiff] On the formative, final evaluations.  That's what I meant.
> Q:     Okay.  So there's a clarification?
> A:     Yes, ma'am.
> Q:     Okay.  So take a look at this document with me.  Do you understand what these numbers mean in the legends here with this document?
> A:     I do.  I do.
> Q:     And if you take a look at "Instructional Planning," did you see that number 4 under "needs development"?
> A:     Yes, I do.
> Q:     That's not considered satisfactory, is it?
> A:     Well, let me clarify again.  When I made that statement, we were talking about the summative.  We're talking about the very end.  Because when you're doing things like this, there's always room for growth; and at the end, that's what we look at.
> Q:     That's fine.  But "needs development" is less than satisfactory, isn't it?
> A:     That would be—"needs development," yes.  But we're not looking at this compartmentalized.  We're looking at the big picture when I made that statement.
> Q:     That's fine.
> A:     Yes, but I want you to make sure we understand that . . . We're talking about the summative, the overall year, not this, because there's room for growth for you, for anyone.
> . . .
> Q:     Would you agree with me that "needs development" is a lesser rating than "proficient"?

4

2013-2014 school-year.  (Def. SMF ¶ 8).  Upon her placement with Hope Hill,

Wheeler had ten years' experience as a principal and twenty-four years' total

experience in the public school system.  (*Id.* ¶ 10-11).  As a principal, she received

only "proficient" or "exceeds" ratings in her end-of-year summative evaluations.

(*Id.* ¶ 12; *see also* Wheeler Dep. at 32:20-33:4).  Wheeler received one "needs

improvement" during a mid-year evaluation.  (Wheeler Dep. at 33:7-10).  Upon

beginning her position as principal over Hope Hill, Wheeler was charged with

improving instruction and academics there.  (Def. SMF ¶ 15).  At Hope Hill, Ms.

Wheeler was the ultimate instructional leader responsible for evaluating the

proficiency of the school's teachers and determining whether to recommend to

---

> A:     Absolutely
> Q:     And Ms. Lashley rated you "needs development" in "Instructional Planning," didn't she?
> . . .
> A:     Yes, I see that.
> Q:     Okay.  And Ms. Leah Goodwin rated you "needs development" in "Differentiated Instruction" during an October 25, 2012 walk-through; right?
> A:     Okay.
> . . .
> Q:     And Ms. Goodwin also rated you a "needs development" in "Differentiated Instruction" during a December 11th, 2012, Formative Assessment, didn't she?
> A:     Okay.  Yes.
> Q:     And she was not working with Ms. Wheeler at the time was she?
> A:     No.  If you're looking from this, she wasn't working with Ms. Wheeler.  Ms. Wheeler wasn't employed with Atlanta Public Schools at that time.

(Pettigrew Dep. 160:22-165:7).

APS that a teacher's employment be renewed.  (*Id.* ¶ 17; Wheeler Dep. at 38:18-21).

During the following 2013-2014 school-year, Pettigrew taught Reading and English/Language Arts to all fifth-grade students at Hope Hill.  (*Id.* at 218:10-20).  Pettigrew's students achieved higher grades in Reading and English/Language Arts on Georgia's Criterion-Referenced Competency Test ("CRCT") at the end of their fifth-grade year with her than at the end of their fourth-grade year.  (*Id.* at 220:3-8).  During the 2012-2013 school-year, 86% of Hope Hill's fourth-grade students met or exceeded expectations on the reading portion of the CRCT, and 72% of fourth-grade students met or exceeded expectations on the English/Language Arts portion of the CRCT.  (*Id.* at 217:15-18).  And at the end of the 2013-2014 school-year, 88% of Hope Hill's fifth-grade students met or exceeded expectations on the Reading portion of the CRCT, and 88% of fifth-grade students met or exceeded expectations on the English/Language Arts portion.  (Pl. SMF ¶ 144).  In her deposition, Wheeler testified that, because of baseline data indicating Pettigrew's students were not progressing, the administration felt the need to support Pettigrew's instruction with help from other teachers and parent volunteers.[2] (Wheeler Dep. at 221:4-7).

---

[2] Regarding the support instruction Pettigrew received, Ms. Wheeler stated the following:

A. [Ms. Wheeler] There came a point in time which Ms. Pettigrew's benchmark data and baseline data indicated that her students were not progressing and performing like they should have been.  So we had to divvy up and divide some of the responsibilities to other teachers. . . . I know we—we pulled out writing, and I know we pushed in reading support[.]

. . .

Q. [Plaintiff's Counsel] and that could have consisted of Ms. Healy [, the Student Services Team Coordinator,] coming in to take a—do you call it a small group?

A. Correct.

. . .

A. Ms. Healy pushed in because our baseline data at the time was that Ms. Pettigrew's students were not progressing as they should.

. . .

Q. There may have been for a few days a week Ms. Healy pushing in to assist a small group in Ms. Pettigrew's class for part of the year, correct?

A. In addition to others, yes.

Q. And what do you mean by "others"?

A. Well, we had to get support in for the ELA block by way of a volunteer.  A couple—two volunteers, actually.  Some of the other teachers took on some of the ELA responsibility.

. . .

Q. Okay.  So what ultimately happened?  Who took over ELA students and took them away from Ms. Pettigrew?

A. Nobody completely took over.  We ended up double dosing and triple dosing kids because they weren't getting enough quality of instruction in Ms. Pettigrew's class.

. . .

A. I know they were getting additional in social studies and science, they were getting additional with Ms. Healy, and they were getting additional by way of tutors and volunteers.  We had to saturate the class with support.

. . .

A. [W]e had to reconfigure reading, language, and arts at the entire fifth grade.  And I can't recall which students or what portion Mr. Childs was responsible for.

Q. What do you mean "reconfigure"?

A. We could not continue having Ms. Pettigrew be solely responsible for all reading, language, and arts in fifth grade.

. . .

7

During the 2013-2014 school-year at Hope Hill, Pettigrew received several evaluation ratings of "Ineffective" and "Needs Development" from both Wheeler and Goodwin-Black.  (Def. SMF ¶ 18; Pettigrew Dep. at 197-211).  The majority of her negative observations came from Goodwin-Black, who was her direct supervisor.  (*Id.* at 24:8-13, 209:1-6).  On October 3, 2013, Wheeler placed Pettigrew on a professional development plan, which identified several deficient areas of her performance and mandated several tasks that were meant to facilitate her improvement as a teacher.  (*See* Wheeler Dep. at 110:14-16; Pl. SMF ¶ 97; *see generally* Doc. 28-15 at 20-25).  Among those tasks were the requirements that Pettigrew "meet with Mrs. Crawford [an instructional coach] every Monday for support with instructional planning[,]" and submit several summary papers detailing her plans for improvement following her completion of professional development courses.  (Doc. 28-15 at 20, 21).  The PDP also included various

---

Q. Okay.  Now, Ms. Pettigrew taught all of the fifth grade students ELA and reading all year, correct?
A. Correct, with the support of the reconfiguration plan.
. . .
Q. So does teaching fifth grade ELA have, in your opinion, zero percent impact on the grades that fifth graders make on the ELA portion of the CRCT?
A. Because of the levels of support that were provided, it's hard to distinguish who was responsible.

(*Id.* at 212:2-5, 212:22-24, 213:22-24, 220:17-25, 221:12-18, 221:22-222:1, 225:14-21, 230:7-11, 231:2-7).

goals for her development, which included delivering "instruction that is engaging [and] academically challenging," "differentiat[ing] instruction to mee the needs of her highest and lowest performing students[,]" "maximiz[ing] instructional time[,]" and "creat[ing] and sustain[ing] a positive learning environment that is free from sarcasm and disrespect." (*Id.* at 20).

Wheeler issued several "letters of direction" to Pettigrew over the course of the 2013-2014 school-year.[3]  (Def. SMF ¶¶ 20-27).  Wheeler testified that under general disciplinary practice, letters of direction serve as written charges of discipline that fare generally issued following a verbal and written warning. (Wheeler Dep. at 82:16-83:13, 208:4-9).  Wheeler testified that, as principal, she was entitled to use discretion in applying discipline, with guidance from APS' associate superintendent, its human resources department, and its Teacher Keys department, which oversees the evaluation process of teachers. (*Id.* at 196:4-13).

---

[3] Plaintiff was issued the following letters of direction:  on September 19, 2013 for her failure to accurately report data for a student being evaluated for special education services, (Def. SMF ¶ 20); on September 23, 2013 for failing to attend a meeting about the inaccurate student data, (*id.* ¶ 21); on October 10, 2013 involving a physical altercation with a student, (*id.* ¶ 22); on October 16, 2013 involving inappropriate classroom management behaviors including physical contact and leaving students unsupervised, (*id.* ¶ 23); on October 21, 2013 for failing to prepare for a meeting involving a student's evaluation for special education services, (*id.* ¶ 24); on December 9, 2013 for failing to complete assigned tasks associated with her professional development plan and failing to meet with a curriculum specialist on five separate occasions, (*id.* ¶ 25); on January 17, 2014 for failing to provide accurate student data for special education evaluation, (*id.* ¶ 26); and on February 10, 2014 for failing to submit student grades on a weekly basis.  (*Id.* ¶ 27).

On March 3, APS's Chief Human Resources Officer, Ron Price, notified Pettigrew that Wheeler recommended the non-renewal of her employment contract for the 2014-2015 school-year.  (*See* generally Doc. 28-14 at 48).  On June 3, 2014, APS Superintendent Errol B. Davis, Jr. notified Pettigrew by letter of his official recommendation of non-renewal made to APS's Board of Education pending a hearing.  (*See* Doc. 28-14 at 60-71).  Davis's letter charged Pettigrew with: "incompetency, insubordination, willful neglect of duties, and other good and sufficient cause."  (*Id.* at 60) (internal quotation omitted).  In accordance with the Fair Dismissal Act, O.C.G.A. § 20-2-942, *et seq.*, a hearing on Pettigrew's non-renewal was conducted on September 18, 2014 before a hearing officer and a tribunal of three members.  (*See generally id.* at 72-74).  Pettigrew was represented by counsel at the hearing, and was permitted to introduce evidence surrounding the reasons for her non-renewal.  (Def. SMF ¶ 42).  She did not raise the issue of age discrimination at her tribunal.  (*Id.* ¶ 43).  The tribunal sustained the charges of incompetency, insubordination, willful neglect of duties, and other good and sufficient cause, and "unanimously recommend[ed] that [Pettigrew's] employment and contract be non-renewed."  (Doc. 28-14 at 73).  On October 7, 2014, APS issued a letter to Pettigrew notifying her that it had adopted the findings and recommendation of the tribunal not to renew her contract.  (*See generally id.* at 75-76).  Pettigrew did not appeal the tribunal's decision.  (Def. SMF ¶ 44).

After Pettigrew's termination—and the departure for unknown reasons of John Childs, another fifth-grade teacher over the age of forty—two new fifth-grade teachers, aged thirty-six years old and thirty-nine years old, were hired at Hope Hill.  (Doc. 36 at 7).

## DISCUSSION

## I.      Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by[] . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c)(1).  The moving party has an initial burden of informing the court of the basis for the motion and showing that there is no genuine issue of material fact.  *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986); *see also Arnold v. Litton Loan Servicing*, *LP*, No. 1:08-cv-2623-WSD, 2009 U.S. Dist. LEXIS 119787, at *10 (N.D. Ga. Dec. 23, 2009) ("The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact." (citing *Herzog v. Castle Rock Entm't*, 193 F.3d

1241, 1246 (11th Cir. 1999)).  If the non-moving party will bear the burden of proving the material issue at trial, then in order to defeat summary judgment, she must respond by going beyond the pleadings, and by her own affidavits, or by the discovery on file, identify facts sufficient to establish the existence of a genuine issue for trial.  *See Celotex*, 477 U.S. at 322, 324.  "No genuine issue of material fact exists if a party has failed to 'make a showing sufficient to establish the existence of an element . . . on which that party will bear the burden of proof at trial.' "  *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1186-87 (11th Cir. 2011) (quoting *Celotex*, 477 U.S. at 322).

Furthermore, "[a] nonmoving party, opposing a motion for summary judgment supported by affidavits[,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991), *cert. denied*, 506 U.S. 952 (1992*); see also* FED. R. CIV. P. 56(c)(1)(B), (c)(4).   The evidence "cannot consist of conclusory allegations or legal conclusions." *Avirgan*, 932 F.2d at 1577.  Unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. *See Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 714 (11th Cir. 1984).

For a dispute about a material fact to be "genuine," the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50 (internal citations omitted).  It is not the court's function at the summary judgment stage to determine credibility or decide the truth of the matter.  *Id.* at 249, 255.  Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor."  *Id.* at 255.

## II.   <u>Pettigrew's ADEA Claim</u>

### A.    **Analytical Framework For ADEA Claims**

The ADEA provides in relevant part, that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such an individual's age."  29 U.S.C. § 623(a)(1); *see also Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1270 (11th Cir. 2014) ("The ADEA, whose purpose is 'to promote employment of older persons based on their ability rather than age,' 29 U.S.C. § 621(b), prohibits certain actions by an employer, including the termination of, or deprivation of employment opportunities against, an employee who is at least 40

years old because of that employee's age." (citing 29 U.S.C. §§ 623(a)(1)-(2), 631(a))).

"A plaintiff may support a claim under the ADEA through either direct evidence or circumstantial evidence." *Mazzeo*, 746 F.3d at 1270. "To ultimately prevail, '[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the "but-for" cause of the challenged employer decision.' " *Id*. (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)).  In *Gross*, the Court rejected the application to ADEA claims of the burden-shifting scheme used in Title VII mixed motive cases, i.e., if the plaintiff presents evidence that an impermissible characteristic played a motivating factor in the employment decision, the burden of persuasion shifts to the employer to prove by a preponderance of the evidence that it would have taken the same action in the absence of the impermissible motivation.   557 U.S. at 171-74. Instead, the Court observed that, unlike Title VII, the text of the ADEA does not authorize a mixed-motive age discrimination claim, and held that "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action," and "[t]he burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when

a plaintiff has produced some evidence that age was one motivating factor in that decision." *Id.* at 173-80.

Thus, "[t]he ADEA requires that 'age [be] the "reason" that the employer decided to act.' " *Mora v. Jackson Mem. Found., Inc.*, 597 F.3d 1201, 1204 (11th Cir. 2010) (quoting *Gross*, 557 U.S. at 176). "Because an ADEA plaintiff must establish 'but for' causality, no 'same decision' affirmative defense can exist: the employer either acted 'because of' the plaintiff's age or it did not." *Id.* (citing *Gross*, 557 U.S. at 180); *see also Smith v. CH2M Hill, Inc.*, 521 Fed. Appx. 773, 774-75 (11th Cir. 2013) (unpublished decision) (explaining that it is not sufficient to allege that age "substantially motivated" the challenged employment decision, rather "[a]n age discrimination claim under the ADEA . . . requires that age be the but-for cause of the termination"); *Avera v. Airline Pilots Ass'n Int'l*, 436 Fed. Appx. 969, 978 (11th Cir. 2011) (unpublished decision) ("Although a Title VII plaintiff may prove his case by showing that his membership in a protected class played a 'motivating part' in the employment decision, an ADEA plaintiff must prove that age was the 'but for' cause of the employer's adverse decision," i.e., "the ADEA does not permit a 'mixed-motive' claim for disparate treatment." (citing *Gross* and *Mora*)); *Collins v. Fulton Cnty. Sch. Dist.*, No. 1:12-CV-1299-ODE-JSA, 2012 U.S. Dist. LEXIS 187392, at *45 (N.D. Ga. Dec. 26, 2012) ("Under the ADEA, a plaintiff must ultimately prove at trial that age was a

'determinative factor' in the employment decision, or, in other words, that the decision at issue would not have occurred absent the age discrimination."), *adopted in part and modified in part on other grounds by* 2013 U.S. Dist. LEXIS 46388 (N.D. Ga. Feb. 27, 2013).

"Where, as here, a plaintiff proffers circumstantial evidence to establish an ADEA claim, [the courts] apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Mazzeo*, 746 F.3d at 1270 (citing *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332-33 (11th Cir. 2013)). "Under this framework, a plaintiff must first establish a *prima facie* case of age discrimination." *Id.* (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000)). "If [s]he does so, the burden of production shifts to the employer 'to articulate a legitimate, nondiscriminatory reason for the challenged employment action.' " *Id.* (quoting *Chapman*, 229 F.3d at 1024). "If the defendant articulates at least one such reason, the plaintiff is then given the opportunity to show that the employer's stated reason is merely a pretext for discrimination." *Id.* The Eleventh Circuit has made clear that courts continue to apply the *McDonnell Douglas* evidentiary framework to ADEA claims even after the Supreme Court's decision in *Gross* because the burden of *persuasion* never shifts to the employer under that framework. *See Sims*, 704 F.3d at 1332-33.

16

### B.   *McDonnell Douglas* **Analysis**

### 1.   *Prima Facie* **Case**

"[A] plaintiff may establish a *prima facie* case for an ADEA violation by demonstrating that: (1) [s]he was a member of a protected class; (2) [s]he was subjected to an adverse employment action; (3) [s]he was qualified to do the job; and (4) [s]he was replaced by or otherwise lost a position to a younger individual." *Mitchell v. City of Lafayette*, 504 Fed. Appx. 867, 870 (11th Cir. 2013) (unpublished decision).  The fourth prong can also be satisfied by a showing that the employer "treated employees who were not members of the [plaintiff's] protected class more favorably under similar circumstances."  *Washington v. UPS*, 567 Fed. Appx. 749, 751 (11th Cir. 2014) (unpublished decision).

While APS "contends that Plaintiff's deficiencies and ineffectiveness in critical performance areas rendered her ineffective to continue to work as a teacher at APS and therefore, she cannot establish a *prima facie* case of discrimination," (Doc. 28-2 at 10), Defendant also states that "For Purposes Of Summary Judgment Only, Defendant Will Assume The Existence Of A *Prima Facie* Case Of Age Discrimination Based On Circumstantial Evidence."  (*Id.*).  Pettigrew argues that she "was qualified to perform as a fifth [] grade teacher, as [she] had taught for fifteen [] years and never received [a] summative review score of less than satisfactory."  (Doc. 36 at 7 & n.12 (citing *Pace v. S. Ry. Sys.*, 701 F.2d 1383, 1386

n.7 (11th Cir. 1983) ("where a plaintiff has held a position for a significant period of time, qualification for that position, sufficient to satisfy the test of prima facie case can be inferred[.]"))).

The undersigned will assume for the sake of discussion that Pettigrew has set forth a *prima facie* case for purposes of summary judgment. As discussed below, however, the undersigned finds that Pettigrew has not created a genuine issue of fact concerning whether APS's articulated legitimate, non-discriminatory reasons for non-renewing her contract were pretextual.

### 2. Defendant's Articulated Legitimate, Non-Discriminatory Reason For Non-Renewal Of Plaintiff's Contract

The employer's burden to articulate a legitimate, non-discriminatory reason for its employment decisions is one of production, not persuasion. *Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1331 (11th Cir. 1998). This burden is "exceedingly light." *Turnes v. Amsouth Bank, N.A.*, 36 F.3d 1057, 1060-61 (11th Cir. 1994) (internal quotation omitted). In his letter of intention to recommend non-renewal of Plaintiff's contract to the board of education, APS's Superintendent charged Pettigrew with incompetency, insubordination, willful neglect of duties, and "any other good and sufficient cause" under O.C.G.A. § 20-2-940(a). (Doc. 28-14 at 60). For support, Davis's letter referred to the following occurrences: (1) twenty-five "Ineffective" and thirteen "Needs Development" scores on instructional evaluations conducted by Wheeler or Goodwin-Black during the

18

2013-2014 school-year, (*see id.* at 61-62); (2) Pettigrew's use of lesson plans not aligned to the curriculum, (*id.* at 62); (3) Pettigrew's failure to complete tasks and consistently implement strategies from her PDP, (*id.*); (4) Pettigrew's failure to "provide accurate progress monitoring for N.D[.]," (*id.*); (5) Pettigrew's failure to "adequately complete the Black History [assignment] as requested by Principal Wheeler," (*id.*); (6) Pettigrew's consistent failure to enter grades on a weekly basis, (*id.*); (7) Pettigrew's consistent "fail[ure] to timely submit lesson plans as required by [her] Professional Development Plan[,]" (*id.*); (8) Pettigrew's submission of old lesson plans when current plans were requested, (*id.* at 62); and (9) Pettigrew's failure to meet with the instructional coach by December 6, 2013 as requested by Wheeler.  (*Id.*).

The undersigned thus finds that APS has met its "exceedingly light" burden of articulating a legitimate, non-discriminatory reason for its termination decision.

### 3.    Pretext

Because APS has articulated legitimate, non-discriminatory reasons for terminating Pettigrew, to survive summary judgment, she must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Chapman*, 229 F.3d at 1024 (quoting *Combs v. Plantation Patterns,*

19

*Meadowcraft, Inc.*, 106 F.3d 1519, 1528 (11th Cir. 1997)).  The court's role at this juncture is to "evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Combs*, 106 F.3d at 1538 (internal quotation omitted).  In making the required pretext showing, "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer."  *Chapman*, 229 F.3d at 1030.  Rather, "[p]rovided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."  *Id.*

Pettigrew offers the following two reasons in support of her position that the nonrenewal of her contract was pretext for age discrimination:  (1) Wheeler exhibited "a pattern of unreasonable conduct toward employees over at least forty [] years old[;]" and (2) genuine fact issues "cast serious doubt upon whether APS—Ms. Wheeler and her administration, in particular—in 'good faith' believed that Ms. Pettigrew's performance justified the four charges."  (*Id.* at 9, 16).  The undersigned finds that Pettigrew's cited evidence fails to create a genuine issue of

material fact on whether APS's articulated reasons for declining to renew her contract were pretext for age discrimination.

### a. Discriminatory Animus

Pettigrew contends that "[a] pattern of unreasonable conduct toward employees over at least forty [] years old evidences a discriminatory animus probative of age discrimination." (*Id.* at 9 (citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999))). Pettigrew relies on *Damon* for support, arguing that "Wheeler's actions at Hope[]Hill were strikingly similar to the new supervisor's actions in *Damon* and similarly evidence discriminatory animus probative of age discrimination." (Doc. 36 at 9).

In *Damon*, the Eleventh Circuit found that summary judgment was improper where a district manager of seven area supermarkets terminated five older store managers (out of a total of seven) and replaced them with five younger managers. 196 F.3d at 1365. In addition to the number of managers terminated or demoted, the court also found both the district manager's written reprimands of older managers with good work histories and a remark by the district manager that he "wanted 'aggressive, *young* men' like himself to be promoted" as "probative evidence of the state of mind of the decision-maker at the time of [the plaintiff]'s termination." *Id.* at 1361-62 (emphasis in original). In light of that evidence, the court "conclude[d] that Appellants have offered evidentiary support by which a

21

reasonable jury could conclude that the specific reasons for termination given by [the defendant] were a pretext." *Id.* at 1363.

Here, Pettigrew points to a variety of occurrences that she contends form the basis for a discriminatory animus like that recognized in *Damon*. First, Pettigrew argues that "Wheeler's pattern of replacing older workers . . . with younger workers is probative circumstantial evidence of age discrimination." (Doc. 36 at 11). In her response to APS's summary judgment motion, Pettigrew attaches a chart listing, in one column, seven former employees no longer working at Hope Hill who were over forty years old, and in the other column, nine employees hired as purported replacements, who range in age from twenty-six to thirty-nine years old. (*Id.* at 10). Pettigrew also argues that "Wheeler [] gave negative written reviews and reprimands to employees who had many years of good performance reviews." (*Id.* at 11). Pettigrew cites herself as an example, stating that "she had taught in APS for fifteen [] years before Ms. Wheeler came to Hope[]Hill. For all fifteen [] years, Ms. Pettigrew had received scores of 'satisfactory' and above on her summative (i.e. annual) reviews. Ms. Pettigrew had an outstanding performance history within APS prior to Ms. Wheeler's arrival at Hope[]Hill." (*Id.*). Pettigrew also points to the good employment history of Angela Jackson, a fellow teacher aged fifty-two years old Wheeler recommended for non-renewal, who "consistently received scores of at least 'satisfactory' on her written

22

evaluations" "in her twenty [] prior years in APS", as evidence that Wheeler had a discriminatory animus toward older teachers.  (*Id.* at 12).  Finally, Pettigrew points to Wheeler's placement of herself, Jackson, and two other teachers on professional development plans as evidence of discriminatory animus because they were all over forty years old.  (*Id.* at 14).

APS argues that Plaintiff's evidence of Wheeler's personnel decisions with regard to other teachers should not be considered because it constitutes "me too" evidence of discrimination that is generally disfavored by courts in this Circuit. (*See* Doc. 45 at 2-4).  It is true that this court has disfavored evidence of discrimination or retaliation of employees other than the plaintiff—so-called "me too" evidence—where doing so would necessitate "a mini-trial to litigate whether the witnesses were, in fact, 'discriminated' against."  *Godwin v. Wellstar Health Systems, Inc.*, Case No. 1:12-cv-3752-WSD, 2015 U.S. Dist. LEXIS 156720, *14 (N.D. Ga. Nov. 18, 2015).  However, this Circuit has allowed such evidence where it may be probative of a decisionmaker's subjective attitudes toward the plaintiff's protected group.  *See Smith*, 644 F.3d 1321, 1341 (11th Cir. 2011) ("[A]cts of discrimination by the same decisionmaker against other employees in the plaintiff's protected group" are "admissible under Fed. R. Evid. 404(b) because that evidence is probative of the decisionmaker's discriminatory intent[.]") (citing *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1286 (11th Cir. 2008)).  Here,

the undersigned finds it unnecessary to determine the admissibility of Wheeler's personnel decisions with regard to other teachers at Hope Hill because even in light of those decisions, Pettigrew has failed to create an issue of fact with regard to whether Wheeler possessed a discriminatory animus toward older employees for the reasons that follow.

At the outset, Pettigrew's reliance on *Damon* is misplaced because the facts in that case are easily contrasted with the facts here. First, the *Damon* court specifically pointed out that the defendant's district manager terminated four "out of a total of *seven* managers" who were older, replacing them with younger counterparts. 196 F.3d at 1361 (emphasis in original). In contrast, Pettigrew does not point to a ratio of employees who were non-renewed and replaced to the total number under Wheeler's supervision. This prevents a fair comparison of the personnel actions taken by Wheeler to the four of out of seven managers that were terminated in *Damon*, which the court found to be compelling circumstantial evidence of a discriminatory animus. *See Damon*, 196 F.3d at 1361. Moreover, the departure and subsequent replacement of older employees that Pettigrew references stand in contrast with those the court found troublesome in *Damon* because only two of those departures appear to have been initiated by Wheeler herself. (Doc. 39-1 at ¶¶ 12-13 (stating that Wheeler gave Whitaker a low performance review and he was told by Human resources that "my services were

24

no longer needed for the next school-year")).  The record indicates that three of the teachers who were replaced with younger employees left Hope Hill voluntarily at the end of the year,[4] and the reasons for the departures of Karen Sharp and Paula Morris are unclear.  (*See* Pettigrew Dep. at 251:20-252:4).  The record thus illustrates that Wheeler was only directly responsible for recommending the non-renewal of two employees for whom she hired younger replacements, rendering the termination and replacement of four of out of seven employees in *Damon* an unfair comparison.

Pettigrew's argument that Wheeler's written reprimands of Pettigrew and Jackson are evidence of a discriminatory animus like the reprimands older employees received in *Damon* is likewise unavailing.  In *Damon*, the court found significant the district manager's pattern of issuing "older managers with good employment histories . . . written reprimands" with apparently fabricated charges.  196 F.3d at 1361.  Conversely, the letters of direction Pettigrew received from Wheeler appear to be based on what Wheeler perceived to be factually accurate information.  For example, on February 10, 2014, Wheeler issued Pettigrew a letter

---

[4] The record indicates that at the end of the 2013-2014 school-year, Linda Blassingame retired (Pettigrew Dep. at 120:15-17; Trimble Dep. 73:6-7); Cheryl Johnson resigned (Pettigrew Dep. at 121:14-15), and John Childs also resigned in order to start his own business.  (Trimble Dep. at 74:9-12, 75:3-12).  And while it is undisputed that Wheeler recommended Jackson's contract be non-renewed, her position does not appear to have been filled by a younger individual.  (*See* Doc. 36 at 10 (omitting Jackson from the list of individuals who were replaced by younger employees)).

of direction for failing to enter grades on a weekly basis. (*See* Doc. 28-15 at 72). The record illustrates that Pettigrew was notified earlier by email in November that many of her grades were missing in the grading system, after grade reports had been run. (*See id.* at 71). Pettigrew herself admitted that she had failed to enter grades on occasion. (Pettigrew Dep. at 278:8). Wheeler also testified that it was her understanding that Goodwin-Black had verbally warned Pettigrew about her failure to enter grades even before Wheeler sent the email in November. (Wheeler Dep. at 143:24-144:2). Similarly, Pettigrew was issued a letter of direction for failing to adequately decorate her door for African-American history month, a task she was informed by Goodwin-Black that Pettigrew had not adequately completed. (*See* Wheeler Dep. at 152:2-8). So, while Wheeler undisputedly issued written reprimands to Pettigrew, the factual basis for the reprimands Pettigrew received distinguish them from the fabricated discipline write-ups in *Damon*.

Finally, Pettigrew has not provided evidence of any remark like the one made by the district manager in *Damon* from which a jury might reasonably infer that Wheeler possessed a discriminatory animus toward older employees. Pettigrew stated in her deposition that Wheeler "said out of her mouth to Robin Glenn that she is going to get rid of all of the old blood—the old dogs in this school." (Pettigrew Dep. at 64:1-3). However, Pettigrew stated that she never directly heard Wheeler utter that statement. (*Id.* at 39:20-24). Pettigrew instead

26

testified that she heard the alleged statement from a fellow teacher, Karen Rowley-Brooks, who heard it from Glenn.   (*Id.* at 64:10-16).   Aside from her indirect allegation based only on hearsay, Pettigrew has not adduced any other evidence of that statement being made by Wheeler, and Glenn herself testified that Wheeler never made the statement to her.   (Glenn Dep. at 50:14-18).[5]   As a result, Pettigrew's testimony that Wheeler made a statement about getting rid of "old blood" is not probative of any discriminatory animus on her part.  *See Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value.").

Pettigrew has thus failed to create an issue of fact on whether Wheeler possessed a discriminatory animus.  However, even if she were able to demonstrate

---

[5] Pettigrew's other testimony about a remark made by Wheeler is likewise unsupportive of the type of remark the Eleventh Circuit found probative in *Damon*. She testified that "[e]verybody knew [that Ms. Wheeler] came to clean house and she wanted to get the old blood out."  (Pettigrew Dep. at 37:8-10).  Plaintiff further stated that she "never heard [Ms. Wheeler] personally say that."  (*Id.* at 40:22-23). Plaintiff testified that Sharon Mitchell, a fellow teacher, told her that Ms. Wheeler was "cleaning house and she wants to get rid of the old blood," (Pettigrew Dep. at 54:20-23), and that she inferred " 'old blood' means over 40."  (*Id.* at 55:11-19). Plaintiff also testified that Michelle McDaniel, another employee at Hope Hill during the 2013-2014 school-year, told her Ms. Wheeler " 'is coming to clean house.' "  (*Id.* at 59:2).  But Pettigrew stated that she had not obtained statements from either Mitchell or McDaniel to support their statements.  (*Id.* at 56:2-9, 62:15-18).  The undersigned considers such indirect and uncorroborated evidence far from "merely colorable" or "significantly probative," let alone the type of evidence that would enable "a reasonable jury [to] return a verdict for" Pettigrew. *Anderson*, 477 U.S. at 258.

such an animus, Pettigrew would still fail to create an issue of fact on which a reasonable juror could infer that Wheeler's discriminatory animus was the "but-for" cause of her recommendation of non-renewal.  *See Sims*, 704 F.3d at 1334 (finding that the plaintiff's evidence "f[e]ll far short of satisfying [his] burden of proving that age bias on the part of [his supervisor] was the 'but-for' cause" of his termination); *see also Coar v. Pemco Aeroplex, Inc.*, 372 Fed. Appx. 1, 4 (11th Cir. 2010) (awarding summary judgment to employer where the plaintiff failed to adduce sufficient circumstantial evidence of discriminatory animus).  The undersigned thus finds that Pettigrew's reliance on *Damon* is misplaced, and her argument that a fact issue exists as to whether Wheeler was acting with a discriminatory animus toward employees over the age of 40 is far-fetched in light of the scant record evidence for that assertion.

### b.  Insufficient Reasons For Non-Renewal

Pettigrew next attacks a handful of the legitimate, nondiscriminatory reasons APS proffered for her non-renewal, maintaining that genuine fact issues "cast serious doubt upon whether APS—Ms. Wheeler and her administration, in particular—in 'good faith' believed that Ms. Pettigrew's performance justified the four charges."  (*Id.* at 16).

First, Pettigrew points to increases in the CRCT scores of her students as "independent evidence of [her] classroom success" sufficient to create an inference

28

of pretext with regard to APS's charge of incompetency. (*Id.*). As mentioned above, Pettigrew's students achieved higher scores on the CRCT on average during their fifth-grade year with her than in their fourth-grade year.[6]

Though it is undisputed that Pettigrew's students improved during their fifth-grade year, the undersigned finds this data alone insufficient to rebut the charge of incompetency, let alone APS's other reasons for recommending her non-renewal, which included insubordination, willful neglect of duties, and "any other good and sufficient cause." (*See* Doc. 28-14 at 60). Wheeler testified that, as a principal, it is "difficult to identify" the extent to which CRCT scores reflect the "quality of instruction" students have received. (Wheeler Dep. at 230:16-24). Glenn, Hope Hill's curriculum specialist during the 2013-2014 school-year, testified similarly when asked about how CRCT scores reflect on a teacher's competency, stating that a number of factors beyond a teacher's instruction could be responsible for higher CRCT scores. (Glenn Dep. at 56:12-21). Further, the record illustrates that Pettigrew was not the only teacher responsible for the instruction of her students. (*Id.* at 220:9-12). Wheeler stated that a number of

---

[6] Pettigrew taught all Hope Hill fifth-grade students Reading and English/Language Arts, and for the 2013-2014 school-year, her students increased their end-of-year CRCT scores from the previous year by 2% on the Reading portion and by 16% on the English/Language Arts portion. (Wheeler Dep. at 211:19-21, 217:15-218:20; Pl. SMF ¶ 44). Further, the number of Pettigrew's students who exceeded expectations on the CRCT's Reading and English/Language Arts portions increased from 18% to 21%, and from 5% to 20%, respectively, from fourth- to fifth-grade. (Doc. 36 at 16-17).

individuals were needed in order to support Pettigrew after baseline data showed that her students were not progressing at an adequate pace.  (Wheeler Dep. 212:2-5).  Because multiple individuals were ultimately responsible for the instructions the students received during the 2013-2014 year, Wheeler testified that it would be difficult to determine the impact of those students' CRCT scores on Pettigrew's competency.  (*Id.* at 231:2-7).

The record further reveals that Pettigrew exhibited a pattern of behaviors consistent with incompetency.  As early as September 5, 2013, before the initiation of her PDP, Wheeler emailed Pettigrew feedback of instructional areas "identified as needing immediate improvement," based on her informal observations and the lesson plans Pettigrew had submitted.  (*See* Doc. 28-14 at 42).  Pettigrew herself testified that she did not disagree with Wheeler's estimation that she could improve in the areas of instructional strategies, differentiated instruction, and the creation of a more academically challenging environment. (See Pettigrew Dep. at 101:1-103:5).  Moreover, Pettigrew has failed to make clear how her students' CRCT scores figured into Wheeler's recommendation in light of the fact that Wheeler notified Pettigrew of her decision not to renew on February 7, 2014—well before CRCT scores were released in the spring.  (Doc. 28-15 at 56; Wheeler Dep. at 211:2-7).  Finally, even if the scores from Pettigrew's students could cognizably form an independent basis for Pettigrew's competence as a teacher, they have no

bearing on APS's other legitimate, nondiscriminatory reasons for her non-renewal, including "insubordination," "willful neglect of duties" and "other good and sufficient cause." *See Knott v. Dekalb Cnty. Sch. Sys.*, Civil Action no. 1:11-cv-2683-SCJ, 2014 U.S. Dist. LEXIS 185127, at *82 (N.D. Ga. July 15, 2014) ("To satisfy this burden for showing pretext, Pettigrew must meet head on, and rebut, *each* of the legitimate, nondiscriminatory reasons offered by Defendant.") (emphasis added) (citing *Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007)).  So, the average increase in CRCT scores of Pettigrew's students does not create an issue of fact as to whether APS's charges were pretextual.

Pettigrew also argues that she "performed every task on her PDP."  (Doc. 36 at 17).  However, the record illustrates that Pettigrew failed to submit lesson plans for the week of February 10, 2014, and that she failed to meet with Crawford weekly to prepare lesson plans as her PDP required.  (*See* Doc. 28-14 at 62; Doc. 28-15 at 45, 47).  In a letter of direction regarding her PDP, Wheeler stated that: "Your failure to adhere to the directive to meet with Mrs. Crawford and plan the model lesson by December 6, 2013 is insubordinate.  You are being directed, for the sixth time, to meet with Mrs. Crawford by Thursday, December 12, 2013 in order to plan for a model lesson to be redelivered."  (Doc. 28-15 at 45).  While Pettigrew contended that she "made it to every scheduled meeting, and it was Ms. Crawford who was unavailable," record evidence shows that Crawford reached out

to Pettigrew to schedule meetings on multiple occasions, (*see id.* at 49, 50), and documentation from Pettigrew's PDP confirms that she had not been meeting with Crawford as directed.   (*See id.* at 55 ("Ms. Pettigrew is not meeting with Ms. Crawford on a consistent basis."); *see also id.* at 57).   However, even if Crawford was responsible for the missed meetings, Pettigrew's PDP reviews illustrate that many of her assigned tasks went incomplete.   (*See id.* at 55).   For example, the minutes for Pettigrew's PDP conference on December 2, 2013 indicate that "Ms. Pettigrew did not complete the assignment that was due on 12/9/13" and "Ms. Pettigrew did not properly complete the assignment that was due on 11/22/13." (*Id.* at 55).   And Pettigrew's final PDP Completion Review stated that "she has inconsistently provided the necessary documentation in a timely manner for administrative request," and that "[w]hile moving students into the Student Support Team process, her documentation has been consistently late and progress monitoring has been inaccurate."   (*Id.* at 59).   Thus, the documentation in the record exhibits a pattern of intermittent compliance with her PDP's assignments and directives, which contradicts Pettigrew's contention that she fully complied with her PDP requirements.   (*See generally id.* at 57-59).   *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could

believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Pettigrew also finds fault with APS's position that she failed to adequately decorate her door for Black History Month, arguing that Wheeler "even admit[ted] Ms. Pettigrew's door satisfied the rules for the Black History Month door." (Doc. 36 at 19). The assignment in question mandated that all fifth-grade teachers display African-American politicians, and directed in relevant part: "Cover the Entire Door (Butcher/Wrapping Paper) . . . Additional Items can be displayed on table outside of door." (Doc. 28-12 at 59). Wheeler testified that, in her opinion, the door Plaintiff's counsel represented as Pettigrew's door was not adequately decorated according to the assignment's directives. (*Id.* at 155:14-15).

Further, as mentioned above, Wheeler had apparently delegated the evaluation of door-decorating to Goodwin-Black, so that the reason Wheeler issued a letter of direction to Pettigrew was based on Goodwin-Black's observation—not her own. (*See* Wheeler Dep. at 23-153:2). Apparently, based on her observation of Pettigrew's door, which was covered with butcher paper and displays a small poster of historical African-American leaders along with a handwritten phrase that reads "Just Elected," Goodwin-Black decided that Pettigrew had not complied with

the directives in the assignment.[7]   (Doc. 28-12 at 60).   The actual level of decoration of Pettigrew's door therefore has no bearing on the legitimate and nondiscriminatory reason Wheeler had for issuing discipline on that basis, and it is not for Pettigrew to simply quarrel with the wisdom, correctness, or fairness of that decision.   She has therefore failed to create an issue of fact on whether her failure to complete this assignment was pretext for age discrimination.   *See Chapman*, 229 F.3d at 1030 ("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."); *see also Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the *employer's beliefs*, not

---

[7] The letter of direction issued in regard to this incident, authored by Goodwin-Black, reads in part:

> Today, February 24, 2014 at 8:00 AM, I came by to check your door and there was a poster and some writing on the paper.  I asked if you were going to add anything else to the door, and you stated, "I asked Ms. P. Jackson (Art Teacher) for some help, but you were fresh out of ideas."  You then asked if I had any suggestions and I stated "No, I do not."  This was a great activity that you could have involved students in to ensure that your door be completed on time.  Your failure to adequately complete the door is a willful neglect of your duties and responsibilities.  This is a direct violation which negatively impacts your performance according to TKES Standard 9 and 10.

(Doc. 28-12 at 61; *see also* Wheeler Dep. 152:20-153:2 (Q. Now, this letter of direction is written from Ms. Goodwin-Black, correct?  A. Correct.")).

34

the employee's beliefs, and, to be blunt about it, not on reality as it exists outside of the decision maker's head.") (emphasis added).

Finally, Pettigrew argues that "Ms. Wheeler's discriminatory animus creates a legitimate question as to whether Ms. Wheeler, in good faith believed Ms. Pettigrew's performance to be unsatisfactory."   (Doc. 36 at 20).   However, as discussed above, Pettigrew has failed to adduce sufficient evidence raising an issue of fact on whether Wheeler acted with a discriminatory animus in her conduct toward employees over forty years old.   Pettigrew has therefore failed to raise an argument that any discriminatory animus toward older employees lay behind Wheeler's ultimate finding of incompetence.  *See, e.g.*, *Sims v. MVM, Inc.*, 704 F.3d 1327, 1334 (awarding summary judgment to employer where "the weak or nonexistent inference of age bias urged by [the plaintiff] simply cannot carry [his] burden in light of the record evidence").

For the foregoing reasons, Pettigrew has failed to adduce evidence tending to show that APS's charges of incompetency, her failure to complete her PDP, her failure to meet with Crawford, her failure to timely submit her lesson plans, and her failure to adequately decorate her door for Black History Month were pretext for discrimination.   Moreover, even if Pettigrew were able to create fact issues in support of pretext as to all of the above reasons, her ADEA claim would still not survive summary judgment because she has failed to rebut the many other

35

legitimate, nondiscriminatory charges APS cited for not renewing her contract as pretextual.  These additional reasons included her failure to timely submit grades, her submission of repetitive lesson plans, her refusal to align her curriculum with that of APS, and her many negative informal and formal performance evaluations. (*See generally* Doc. 28-14 at 60-71; *see also* Glenn Dep. at 38:15-23; Wheeler Dep. at 179:22-181:5; Doc. 28-15 at 8).  Thus, even drawing all reasonable inferences in favor of Pettigrew, no reasonable jury could conclude that APS recommended that her contract not be renewed because of her age.  *See Liles v. Stuart Weitzman, LLC*, Case No. 09-61448-CIV-COHN-SELTZER, 2010 U.S. Dist. LEXIS 59526, at *21 (S.D. Fla. June 16, 2010) (finding against the plaintiff where he failed to "rebut each of Defendant's proffered reasons head on."); *see also Phillips v. Aaron Rents, Inc.*, 262 Fed. Appx. 202, 211 (11th Cir. 2008) ("[W]e conclude that [the plaintiff] did not rebut, head on, all the reasons given by [the defendant] for his termination.  Accordingly, we find that [the plaintiff] failed to present sufficient evidence of pretext, and that his claim for age discrimination must fail.").

Accordingly, it is **RECOMMENDED** that APS's motion for summary judgment be **GRANTED** as to Pettigrew's ADEA claim.

### III.   Pettigrew's Hostile Work Environment Claim

"To establish a claim of a hostile work environment, an employee must prove that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.' "  *Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1248 (11th Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Specifically, a plaintiff must show:

> (1) [Sh]e belongs to a protected group; (2) [s]he was subjected to unwelcome harassment; (3) the harassment was based on [her] membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability.

*Edwards v. Prime Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010).  APS argues that it is entitled to summary judgment on Pettigrew's hostile work environment claim because she "cannot meet the second, third and fourth elements of this claim." Doc. 28-2 at 19).  Pettigrew responds to this argument by adopting the allegations stated in Defendant's brief—namely, that Wheeler:  (1) "reported an alleged incident of physical contact with a student [] (scratch of arm) outside the school to the Office of Internal Resolution for Investigation[,]" (2) issued a letter of direction to Pettigrew for her physical contact with a student, (3) sent an email to Pettigrew reminding her not to leave her class unattended in the hall; (4) announced

Pettigrew's name over the PA system, requesting to see her, while she did not do this when any other employees; (5) "placed her on a PDP and told her in a nasty tone that she was failing the students[;]" (6) did not say hello to her; (7) spoke to her in a loud tone; and (7) issued letters of direction to her. (*See* Doc. 28-2 at 20-21). In her response, Pettigrew added that "Wheeler would both raise her voice and belittle Ms. Pettigrew on a weekly basis[,]" Wheeler "yell[ed] across the PA system to Ms. Pettigrew," "Wheeler frequently made fun of Ms. Pettigrew when speaking to her, as she would make comments in both a laughing and condescending manner[,]" "[s]everal times, [] Wheeler came into Ms. Pettigrew's personal space to intimidate her[,]" and that "Pettigrew often cried following her interactions with [] Wheeler." (Doc. 36 at 21-22).

First, while Pettigrew points to Wheeler's purported bullying of three other employees over forty years old, she has not presented evidence that individuals outside a protected group were treated more favorably. (*Id.* at 22). Pettigrew has merely listed general workplace grievances without demonstrating a connection between her complaints and her membership in a protected group. Without more, her grievances do not create an issue of fact on her hostile work environment claim. And even if Pettigrew were able to raise a fact issue on whether the alleged incidents were based on her age, she still has not created an issue of fact upon which a jury might find that those incidents were severe or pervasive enough to

38

alter the term or conditions of her employment.  "Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component." *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir. 1999).  " 'The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, . . . [and]  the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.' "  *Adams*, 754 F.3d at 1249 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (internal quotations omitted)).

To satisfy the objective component, a plaintiff must demonstrate that a reasonable person in her position would have found the harassment severe or pervasive.  *Smith v. Naples Cmty. Hosp., Inc.*, 433 Fed. Appx. 797, 799-800 (11th Cir. 2011) (unpublished opinion) (citing *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (en banc)).   When evaluating whether harassment was objectively severe or pervasive enough to alter a plaintiff's terms and conditions of employment, courts consider four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  *Mendoza*,

195 F.3d at 1246.  Generally speaking, " 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.' "  *Mendoza*, 195 F.3d at 1245 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)).

Courts have found more frequent and inappropriate conduct than that cited by Pettigrew as insufficient to objectively alter the terms and conditions of employment.  *See, e.g.*, *McCann v. Tillman*, 526 F.3d 1370, 1378-1379 (11th Cir. 2008) (holding that the plaintiff's allegations or repeated racial insults were not severe and pervasive enough to alter terms of employment); *Barrow v. Georgia Pac. Corp.*, 144 Fed. Appx. 54, 57-58 (11th Cir. 2005) (unpublished per curiam opinion) (finding that the alleged actions of the plaintiff's co-workers were not severe enough to alter the terms of employment where: the letters "KKK" were written on a bathroom wall and on a block-saw console; a noose hung in another employee's locker; repeated use of racially derogatory terms); *Smith v. Beverly Health and Rehab. Servs., Inc.,* 978 F. Supp. 1116, 1120-1122 (N.D. Ga. 1997) (holding that the plaintiff's allegations involving repeated use of racially derogatory terms did not rise to the level of severe and pervasive racial harassment).  Further, only a few instances of conduct cannot suffice to make out a hostile work environment claim.  *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1249 (11th Cir. 1999) (concluding that five inappropriate instances in eleven

months were "far too infrequent" to support a hostile work environment claim); *see also White v. Potter*, No. 1:06-CV-1759-TWT, 2007 U.S. Dist. LEXIS 102731, at *52-53 (N.D. Ga. Mar. 19, 2007) (finding three incidents of touching and "harassing conduct" to not be severe or pervasive), *adopted by* 2007 U.S. Dist. LEXIS 31909 (Apr. 30, 2007).  While many of the instances Pettigrew identifies here plainly could have made her feel uncomfortable, if the above cited authorities, which contain far more frequent and severe behavior, do not satisfy that standard under the governing law, then it cannot be said that a reasonable person in Pettigrew's position would have found the harassment here severe or pervasive enough to alter the terms and conditions of employment.

Therefore, the undersigned **RECOMMENDS** that APS's motion for summary judgment as to Pettigrew's claim for hostile work environment be **GRANTED**.

## <u>CONCLUSION</u>

It is **RECOMMENDED** that Defendant's motion for summary judgment (Doc. 28) be **GRANTED**.  The Clerk is **DIRECTED** to terminate referral of this matter to the undersigned magistrate judge.

**IT IS SO REPORTED AND RECOMMENDED** this <u>19th</u> day of <u>June</u>, 2017.

<u>/s/ J. CLAY FULLER</u>
J. CLAY FULLER
United States Magistrate Judge